**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 09-10004-CIV-MOORE/SIMONTON**

THE COUNTY OF MONROE, FLORIDA,
individually and on behalf of others similarly situated,

       Plaintiff,

v.

PRICELINE.COM INCORPORATED;
TRAVELWEB LLC; TRAVELOCITY.COM LP;
SITE59.COM, LLC; EXPEDIA, INC;
HOTELS.COM, L.P.; HOTWIRE, INC.;
TRIP NETWORK, INC. d/b/a CHEAP TICKETS;
and ORBITZ, LLC,

       Defendants.

_____/

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF ITS**
**MOTION FOR CLASS CERTIFICATION**

## I.  INTRODUCTION

Ignoring the straightforward issues raised in Plaintiff's Motion for Class Certification, Defendants' opposition brief [D.E. #26] ("Opposition") relies entirely on peripheral arguments, none of which establish that the proposed class should not be certified.

Defendants' strategy in their Opposition is consistent with their broad scheme which, over the last several years, has led them to invest substantial resources to fracture out this litigation across the state (and across the country) in an attempt to frustrate struggling county governments and fatigue them into giving up on collecting the substantial amount of hotel tax dollars owed by Defendants.

Fortunately for the county governments of Florida, this Court has been presented with a clean opportunity to address the simple issue which Defendants have spent so much time and money to obfuscate – that is, whether these Defendants' actions fall under the identical operative language in the Enabling Act and in each of the counties' TDT ordinances.  There is no dispute in this case – and, indeed, Defendants have stipulated for purposes of class certification – that the methods by which Defendants transact business with respect to hotels in Monroe County is the same way in which they conduct business with respect to the hotels located in every other county which is included in the proposed class. And as this Court has already recognized, whether the Defendants' behavior falls under the applicable statutory language is the ultimate issue in this case, *see* D.E. #42 at p. 2, and that operative statutory language is identical in all Class member counties.

In the face of such a prototypical case for class certification, the Defendants' Opposition brief raises five primary arguments, most of which are red herrings and each of which Plaintiff will easily refute herein.

*First*, Defendants assert the flawed logic that Monroe County (and other Class member counties), which are governmental entities, must exhaust certain administrative "remedies." In advancing this argument, Defendants ignore the settled case law establishing that the exhaustion of such administrative

remedies is not required when it is the government entity that seeks judicial relief. Defendants further ignore that such remedies are, in point of fact, no more than procedural due process protections which will also be provided to Defendants – in greater magnitude – by this Court.  Moreover, even if the Class member counties were legally required to go through these administrative "remedies" (which we in no way suggest or concede) that exhaustion requirement is excused, under well-settled law, because the notice and assessment demand contemplated by the statutory scheme would be entirely futile in this situation – as Defendants themselves made very clear to Monroe County in direct meetings between the parties over two years ago.

*Second*, Defendants attempt to distract this Court from all of the common issues of law and fact which predominate in this case by fixating on issues that will only be relevant, if at all, at the damages phase of this litigation. As the Eleventh Circuit has clearly held, individualized damages issues will not prevent class certification.

*Third*, Defendants claim that the Class cannot include those counties which do not locally administer the tax, and that the Class therefore lacks numerosity. In fact, those counties *do* have standing to bring this suit, and the Florida Department of Revenue's role (for those counties) will only be relevant, if at all, at the claims administration stage of this litigation as a collection agent. Moreover, even excluding those counties from the proposed Class (which we also do not suggest or concede would be proper), the Class would still be sufficiently numerous for class certification.

*Fourth*, Defendants next allege that a class action is not the superior method of adjudicating this controversy because several lawsuits and administrative proceedings like this case are pending across the State. In fact, the fractured nature of this controversy, which has been orchestrated largely by the litigation tactics of the Defendants (*see* discussion, *infra*), argues directly in favor of resolution of this matter on a class-wide basis in this forum where the parties' rights and obligations can be ruled on, once and for all.

*Fifth*, left without any substantive arguments in opposition to certification, Defendants last tactic is to attack the adequacy of the Class representative. However, as fully described below, that argument is both factually and legally without merit under controlling case law.

As discussed throughout this Reply, other federal courts have certified similar classes of taxing authorities which have brought suit against these same OTC defendants, despite similar arguments that were made in those cases by these OTC defendants.[1] For the many reasons set forth below, a similar result should follow here.

## II. ANALYSIS

### A.   Defendants' "Failure To Exhaust Administrative Remedies Defense To Class Certification Fails For Numerous Reasons.

#### 1.   Defendants Err In Relying on "Exhaustion of Administrative Remedies" Principles.

Defendants argue that Monroe County and certain Class member counties have failed to "exhaust their administrative remedies" because this lawsuit was initiated prior to a formal audit and assessment.  As Defendants accurately point out, the statutory scheme relating to the tourist development tax – Fla. Stat. § 125.0104 and Fla. Stat. § 212.12 – contemplates certain procedures including notice, audit, and assessment.

---

[1]  Defendants spill a fair amount of ink proclaiming that they cannot possibly be subject to the TDT of any taxing authority. *See* Opposition at 1-4. To the County's knowledge, every court and administrative body across the country which has ruled on the merits of one of these OTC tax cases after conducting some evidentiary hearing has ruled in favor of the taxing authority and against the Defendants. *See City of San Antonio, Texas v. Hotels.com. et al.*, Civil No. SA-06-CA-381-OG (W.D. Tex. Oct. 30, 2009) (A federal jury entered a verdict for over $20 million, excluding interest and penalties, in unpaid hotel taxes against these defendants in favor of a class of over 173 Texas cities after a full trial was held in federal court in Texas); San Francisco Office of the Treasurer's letter dated April 30, 2009 to Expedia, Inc. (The San Francisco Tax Administrator determined that Expedia alone owed over $31 million in unpaid hotel taxes.  On April 30, 2009, the San Francisco Office of the Treasurer and Tax Collector affirmed.); *Appeals by Expedia Group, et al. v. City of Anaheim*, (Jan. 28, 2009) (An Administrative Hearing Officer of the City of Anaheim California rendered a ruling against these defendants for over $21 million in unpaid hotel taxes.); *See Travelscape, LLC v. South Carolina Department of Revenue,* No. 08-ALJ-17- 0076-cc (S.C. A.L.C. Feb. 12, 2009) (An Administrative Law Court in South Carolina ordered Expedia to remit unpaid hotel taxes to the City from its sales of hotel rooms.); *See* Department of State Revenue, Letter of Findings No. 08-0434, Jan. 30, 2009 (The Indiana Department of Revenue denied Expedia's protest to a tax assessment, and ruled that it should have remitted taxes on the total amounts collected from its customers for the rental of hotel rooms.); *See Columbus, Georgia v. Expedia, Inc.*, Civil Action No. SU-06-CV-1794-7 (Sup. Ct., Ga., Sept. 22, 2008). (The Superior Court of Georgia held a full evidentiary hearing and then entered a permanent injunction against Expedia to compel it to pay hotel taxes on the full marked up room rates which it received from its customers. The Supreme Court of Georgia affirmed in *Expedia, Inc. v. City of Columbus*, 681 S.E. 2d 122 (Ga. June 15, 2009)).

However, it is simply incorrect to label those procedures as "administrative remedies" which the counties must "exhaust" prior to initiation of a lawsuit. "Exhaustion of administrative remedies" is a principle of separation of powers and judicial efficiency, which is intended to avoid a clogging of the judiciary caused by individuals bringing unnecessary lawsuits *against the government* when an administrative remedy can more easily and/or more efficiently resolve that individual's dispute. In stark contrast, in this case, the governmental bodies (the County taxing authorities) are the plaintiffs bringing suit. In such circumstances, the exhaustion requirement does not apply.

The doctrine of exhaustion of administrative remedies "allow[s] an agency 'greater opportunity to apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts.'" *See Shalala v. Illinois Council*, 529 U.S. 1095, 120 S.Ct. 1084 (2000)) (quoted in *U.S. v. Tenet Healthcare*, 343 F.Supp.2d 922, 935 (C.D. Cal. 2004)). However, where the government "agency itself decides to pursue a judicial remedy, the exhaustion of remedies doctrine is simply not applicable." *United States v. Paternostro*, 966 F.2d 907, 912 (5th Cir. 1992); *Tenet Healthcare*, 343 F.Supp.2d at 935 (government agency is not required to exhaust administrative remedies before it seeks a judicial remedy).

For example, in *FTC v. Singer*, the defendants argued that the FTC should have conducted administrative proceedings before seeking to enjoin the defendants from violating certain anti-fraud rules and seeking redress for victims of an allegedly fraudulent scheme. 534 F.Supp. 24, 26-27 (N.D.Cal. 1981), *aff'd* 668 F.2d 1107 (9th Cir.1982). The court held that the exhaustion requirement "involve[d] procedures an *individual* must utilize to challenge the enforcement of an agency rule against him," *id.* (citing *Moore v. N.Y. Cotton Exchange*, 270 U.S. 593, 46 S.Ct. 367 (1926)) (emphasis added), and "ha[d] no application to the exercise by a governmental agency of its prosecutorial discretion to enforce the law," *id.* (citing *FTC v. Universal Rundle Corp*., 387 U.S. 244, 251, 87 S.Ct. 1622 (1967)). *See also U.S. v. Seibert*, 403 F.Supp.2d 904 (S.D. Iowa 2005) ("Here, the Government need not wait for Seibert to exhaust his administrative

appeals because the exhaustion requirement is only applicable to individuals appealing administrative rulings.")

This principle has also been recognized by courts in the Southern District of Florida. *See U.S., ex rel. Borges v. Doctor's Care Medical Center, Inc.*, No. 01-8112, 2007 WL 984404 at *2-3 (S.D.Fla. 2007) (finding that the United States need not first exhaust administrative remedies prior to bringing an action against a Medicare provider to recover damages under the common law theories of unjust enrichment, payments under mistake of fact, or recoupment of overpayments); *State of Florida v. Tenet Healthcare Corp.*, 420 F.Supp.2d 1288, 1298 (S.D.Fla. 2005) (stating that "the Eleventh Circuit has clarified that actions against a party other than the HHS Secretary or the federal government are not subject to the exhaustion requirements of the [Social Security Act].").

Undersigned counsel has not located any Florida cases which directly address this issue. But Florida courts have, of course, recognized the basic principle that the "failure to exhaust administrative remedies" doctrine is based on the rights of governmental agencies. *See, e.g., Santana v. Henry*, 12 So.3d 843, 846 (1st DCA 2009) ("Notions of administrative autonomy have been thought to require that agencies be given the opportunity to discover and correct their own errors, even after a case has reached the courts for judicial review of agency action.").[2] In this case, non-governmental defendants are seeking to force a governmental taxing authority to exercise what the courts recognize as the ***government's*** "opportunity to discover and correct their own errors." *Id.* Even if that argument were logically sound, the Defendants here have not alleged that there are any administrative errors in need of correcting; rather, this case requires resolution of a threshold legal question that no administrative proceeding could possibly resolve – namely, whether the Defendants are subject to the TDT in the first place.

---

[2] *See also generally Key Haven Associated Enterprises, Inc. v. Board of Trustees*, 427 So.2d 153, 157 (Fla. 1983)("Judicial intervention in the decision-making function of the executive branch must be restrained in order to support the integrity of the administrative process and to allow the executive branch to carry out its responsibilities as a co-equal branch of government.").

What the Defendants have labeled as the County's "administrative remedies" are actually, at most, procedural due process protections that were built into the Enabling Act to provide certain protections for taxpayers before an administrative body can coercively collect taxes from those taxpayers.  In the case before this Court, the Defendants are being provided with the *complete* set of due process protections – that is, all of the notice and opportunity to be heard protections which are provided to defendants in the ultimate judicial fact-finding body – a United States District Court – with full appellate rights in the Eleventh Circuit Court of Appeals.  There is simply no legal authority by which the OTCs are *entitled* to first go through the administrative process rather than receiving full due process protections as defendants in federal court. Moreover, nowhere in the Florida statutes which set forth these due process procedures are federal district courts somehow stripped of jurisdiction to hear a tax enforcement case like this brought by the taxing authorities.

The federal district court in *City of Charleston, S.C. v. Hotels.com, LP* recognized this simple point in a nearly identical case against the OTCs:

> Defendants also argue that by not following the administrate procedures of the [South Carolina state statute] and the Ordinances, Plaintiffs have deprived Defendants of … notice of the proposed tax liability, and an opportunity to be heard. This claim severely misunderstands the nature of due process protection. Defendants are indeed entitled to notice and an opportunity to be heard, but the ordinary course of civil litigation under the Federal Rules of Civil Procedure provides ample protection of these rights. Defendants received notice when they were validly served with the Complaints and subsequent pleadings. Defendants are receiving an opportunity to be heard by being able to litigate the case in an impartial court of law. Nowhere in the pleadings have Defendants alleged that they have actually suffered any sort of deprivation of property. The fact that Defendants may be liable at the conclusion of litigation if a judgment is entered against them certainly does not constitute a violation of the Due Process Clause. Indeed, if the court were to accept Defendants' interpretation of due process rights, it would seem that every civil lawsuit for monetary damages would suddenly be transformed into a constitutional violation.

520 F.Supp.2d 757, 770 (D.S.C. 2007).

Notably, Defendants point to no prejudice by being forced to litigate this matter before this Court. Defendants cannot point to any prejudice because the due process rights in this Court are, if anything, *far more extensive* than those rights which would be afforded under the administrative process.  Moreover, Defendants themselves have recognized the need to have the predicate question of whether they are subject

6

to the tax *in the first place* resolved by a court, as evidenced by the declaratory judgment actions they have filed against Miami-Dade County after that county conducted a full audit and assessment (discussed *infra*).

> 2.    **Even Under Exhaustion Of Administrative Remedies Jurisprudence, The Futility Doctrine Permits (And Specifically Contemplates) Lawsuits Such As This.**

Even if this Court chooses to examine the Defendants' argument in accordance with the typical exhaustion of administrative remedies analysis, well-established law provides that administrative remedies need not be exhausted if doing so would be futile.  *N.B. v. Alachua County School Bd.*¸84 F.3d 1376, 1379 (11th Cir. 1996) ("The exhaustion of the administrative remedies is not required where resort to administrative remedies would be 1) futile or 2) inadequate."). As set forth below, the notice and demand for assessed taxes, which is contemplated by the administrative scheme, would be wholly futile and a significant waste of governmental resources in this case.

First, Defendants conveniently ignore the fact that this Court has already held, in its Order which denied in substantial part the Defendants' Motion to Dismiss [D.E. #42], that any demand by Monroe County for the TDT would have been futile under these circumstances. In their motion to dismiss in this case, Defendants argued that Plaintiff's conversion claim could not survive because Plaintiff had not made a formal demand for the funds prior to initiating this lawsuit. *See* D.E. #24, at 15. This Court found as follows:

> [T]he County's decision not to first demand the disputed funds is excused for the additional reason that, as the course of this litigation indicates, any such demand would have been rebuffed by the Defendants, and would therefore have been futile.

D.E. # 42, at 8-9.

As this Court noted, and as several other courts addressing this very issue have also concluded, "the course of this litigation indicates" the futility of the demand which is contemplated by the statutory scheme. *Id.* These OTC Defendants have been fighting the application of tourist development taxes across the State of Florida and across the country. With respect to Monroe County in particular, prior to the filing of this lawsuit representatives from the OTCs made two special trips to Monroe County where they told County

officials that they do not believe they should be forced to pay the tax and that they do not intend to pay the tax. Deposition of Robert Shillinger ("Shillinger Depo.")[3], p. 15, ln. 22 – p. 16, ln. 9; p. 20, ln. 13-24 (describing first meeting at which the Defendants, *inter alia*, "communicated their position that they didn't think they were liable for the tax."); p. 222, ln. 2-22; Sellers Depo., p. 120, ln. 11-16; p. 129, ln. 14-19. Defendants further presented the Monroe County representatives litigation binder evidencing other collection lawsuits brought by numerous other taxing authorities, along with numerous other documents, and expressed to Monroe County their intention to vigorously litigate any collection effort initiated by Monroe County. Shillinger Depo. p. 20, ln. 19-24; Deposition of Pamela Sellers ("Sellers Depo.")[4] p. 122, ln. 8-16, and Exh. #4 thereto. In response, Monroe County officials made it clear to the OTCs that they were expected to pay the TDT. *Id.* at p. 230, ln. 2-12. Accordingly, Defendants' suggestion in their Opposition brief that they were never put on notice of Monroe County's position (*see* Opposition at 3, bullet points 2-3), or were somehow denied an opportunity to be heard before the filing of this lawsuit is, putting it charitably, wholly disingenuous.[5]

Not only did these Defendants understand that Monroe County expected the Defendants to pay the proper amount of their TDTs, these Defendants are also acutely aware that scores of other taxing authorities across the country have discovered Defendants' scheme to avoid collecting and remitted the appropriate tax amount. As evidenced by the several fractured cases and administrative proceedings occurring across the state, the OTCs are intimately familiar with the position of Florida's taxing authorities on this topic. Indeed, these Defendants are involved in scores of lawsuits and administrative proceedings across the entire country.

---

[3] The entire deposition transcript of Robert Shillinger is attached hereto as Exhibit "A."

[4] The entire deposition transcript of Pamela Sellers is attached hereto as Exhibit "B."

[5] This argument is particularly disingenuous given that lawyers from the same firm who represent the Defendants in this action were the same lawyers who met with Monroe County's officials, and who fiercely advocated the Defendants position that they were not liable for the hotel taxes claimed by Monroe County. *See* Shillinger Depo. p. 17, ln. 17-20 (explaining that a lawyer from McDermott Will & Emery's Chicago office had been sent by the OTCs to participate in the above-described meetings with Monroe County officials).

And, to the County's knowledge, in every one of these cases, Defendants have taken the (repeatedly losing) position on the merits that they are not required to collect and remit the tax on the full retail amount of their room rentals, and that they will not pay this tax until so ordered by a court of law.  *See* Shillinger Depo., p. 222, ln. 2-11.

Indeed, in several cases, including here in Florida, Defendants have insisted that administrative procedures be carried out first, only to then file declaratory judgment actions in court against those taxing authorities, arguing that the Defendants are not subject to the tax in the first place – raising the ***very same arguments*** for non-liability for the tax that they have raised here. One stark example of this game was played out with Miami-Dade County. In 2006, Miami-Dade County initiated a suit in state court against each of these OTC Defendants.   Upon protest by the Defendants, Miami-Dade County voluntarily dismissed that case and instead went through the audit and assessment process first. Three years (and countless dollars) later, after those administrative "remedies" had been pursued, these Defendants responded to the assessment by filing declaratory judgment actions in court against Miami-Dade County, arguing ***not*** that there was any flaw in the administrative findings, but rather that the Defendants were not subject to the tax in the first place. *See* Declaratory Judgment Complaints against Miami-Dade County, attached hereto as Exhibits "C" – "H" (consolidated as, *Orbitz, LLC, et al. v. Miami-Dade County, Fla.,* No. 2009 CA 5006 (2d Jud. Cir.)).

As the OTCs made clear in those declaratory judgment complaints, these OTCs consistently take the position that they are not subject to the TDT at all. *See, e.g.,* Exhibit "F" at 9 ("Because Expedia has not rented, leased or let accommodations in Miami-Dade County, it is not subject to the TDT."); *id.* at 3 ("Because the gravamen of this action is Expedia's contention that it is not subject to the TDT ... and that the imposition of [the TDT] on Expedia violates Florida and federal law, the registration application was submitted to Miami-Dade County under protest. Expedia did not thereby become subject to, and does not

now admit that it is subject to … the TDT."); *id.* at 3 ("Expedia contests the entire amount of the Assessment.").

Now, years after initially filing a tax collection action in state court, Miami-Dade County again finds itself litigating the exact same issue that it had originally raised when it originally filed its tax collection action against these Defendants. Indeed, Miami-Dade County is in a *worse* position now, as it has spent extensive time, money, and lost tax revenue due to the unnecessary delay caused by Defendants' "run around" game. If Defendants have their way, and this matter is not resolved once and for all, on a class-wide basis, Defendants will continue to drag Florida counties through the pointless administrative process in order to delay and exhaust these counties from pursuing the tax revenues to which they are entitled. *See* Schwartz, Administrative Law 510, 510 (1976) ("[W]hy should [a litigant] have to resort to the expensive and time consuming administrative procedures which may convert the exhaustion of remedies into the exhaustion of litigants?")

Officials at Monroe County closely monitored the occurrence in the Miami-Dade County case (and in other cases) and came to the conclusion that this present lawsuit was necessary to resolve this dispute, and that the administrative process was simply being used as a costly delay tactic by the OTCs. As described by one Monroe County taxing enforcement official:

> Bert [Gerez, Monroe County's Senior TDT Auditor] and I had discussed it in the past when we've come back from different conferences and as a result of reviewing these different emails, with, you know, lawsuits, and it doesn't – we came to the conclusion that no one had had any success in dealing with the dot-coms.

Sellers Depo., p. 92, ln. 12-14; *see also* Shillinger Depo., p. 145, ln. 13-17 (Mr. Shillinger was "advised by either Bert or Pam Sellers that they believed that the audit and assessment process, with respect to the online travel companies and the TDT, would have been futile[.]")

Because the "exhaustion of administrative remedies" principle is intended to conserve judicial resources when matters can be resolved instead at an administrative level, the administrative procedures provided in the statutory scheme would be futile because an audit and assessment would not begin to

address the fundamental issue in this case – i.e., whether the TDT is applicable to the Defendants in the first place. As demonstrated through the situation with Miami-Dade County, the administrative process did not (and could not) do anything to resolve the core issues between the parties. Notice and assessment procedures are simply meaningless when the taxpayer is fully and publicly on notice of the tax, and has flagrantly refused to pay the tax at all, regardless of the amount of any assessment. In such a scenario, the threshold and vital question, *which can only be resolved by a court*, is whether the Defendants are subject to this tax in the first place. As the Defendants have made clear, they will be dragging Florida counties through these futile administrative processes, until the proverbial World Court orders them to pay.

Furthermore, contrary to the suggestion in the Defendants' Opposition, the question of the *amount* of the ultimate assessment in this case is a question that can be easily established on a class-wide basis during the damages presentation of Plaintiff's case in chief, in a manner that is far more efficient and fair to all involved than the costly and potentially inconsistent lawsuits and administrative procedures that the OTCs would like to see fractured around this state.[6]

This exact "administrative remedies" issue was raised in *City of Goodlettsville v. Priceline.com*, 605 F.Supp.2d 982 (M.D. Tenn. 2009), a nearly identical case which was brought against these same OTC Defendants.  In that case, as in this one, the statutory taxing scheme contemplated certain administrative procedures such as notice and assessment.  That court first paused to consider the numerous other cases in which these Defendants have wholly refused to collect and remit the appropriate tax:

> Before addressing the parties' respective arguments regarding the plaintiff's argument that the application of the exhaustion requirement in this case would be an exercise in futility, the court pauses to consider the context of the instant litigation. In recent years, municipalities around the country have brought similar lawsuits against [OTCs] such as the defendants, alleging that those entities failed to pay hotel occupancy taxes like the one levied by the City of Goodlettsville. *See City of Charleston v. Hotels.com L.P.*, 520 F.Supp.2d 757, 764 (D.S.C.2007) (listing cases).

---

[6] As explained *infra*, Monroe County's retained expert can easily perform the basic mathematical computation of the taxes, penalties, and interest owed by each Defendant to each Class member county. That calculation can be readily determined using the transactional data which the Defendants have begun (at long last) to produce to the Plaintiff. That transactional data is in Microsoft Excel spreadsheets and is suitable for easy mathematical and formulaic calculations, including factoring in any variations in the tax rate, penalties, or interest applicable in the county in which the room was booked.

*Id.* at 988.  After scrutinizing the decisions in those similar cases, the *City of Goodlettsville* court turned to

the issue of the futility of pursuing costly administrative remedies in light of the Defendants' clear denial that

they fall under the applicable tax statute:

> The fundamental issue underlying the plaintiff's claims is not merely its allegation that the defendants have an outstanding tax obligation but, rather, the legal question of whether the defendants are subject to the Tax Ordinance in the first instance, regardless of the manner in which the plaintiff's claims are framed… This is an issue that the defendants hotly dispute, as evidenced both by the ongoing litigation in other jurisdictions around the country and in the position, taken by the defendants in this case, that they are not subject to the Tax Ordinance. Moreover, this is not an issue that may be resolved through the administrative process but, rather, will require a judicial resolution….

*Id.* at 990.  The *City of Goodlettsville* court then reached the only practical conclusion in this situation:

> Forcing the plaintiff to engage in the administrative process here would serve little purpose, let alone the purposes that underlie the exhaustion doctrine. Judicial involvement at this stage would not be premature, as it would not impinge upon the agency's efficient function, nor is the legal question at issue here one with respect to which the agency's experience or expertise would be especially beneficial. Although the administrative process might provide some benefit, to the extent that it would establish a factual record for judicial review, that factual record will be developed in any case, whether in the context of an administrative proceeding or a judicial one, and this court will no doubt be called upon to resolve the legal question of the application of the Tax Ordinance to the defendants, regardless of the outcome of any assessment that the plaintiff might conduct. Moreover… the defendants have made clear that they object not to the *amount of tax owing,* but rather to the claim that *they owe any tax at all* under the Tax Ordinance. Requiring the plaintiff to first conduct an audit and determine the precise amount of taxes owed by the defendants will not provide the plaintiff with relief. As stated by the court in *City of Charleston,* requiring the Plaintiffs to follow the administrative procedure would be an exercise in futility, and would in no way facilitate the ultimate resolution of the dispute between the parties. … [T]he court certainly does not believe that Defendants would have paid the assessed tax, and the issue would have inevitably ended up in federal court to determine whether the Ordinances apply to Defendants or not. The twin goals of the exhaustion requirement are administrative agency autonomy and judicial efficiency… Here, as in *City of Charleston,* requiring the plaintiff to exhaust administrative remedies would be a charade and would simply delay the inevitable judicial resolution of the legal issues presented, while providing little or no benefit for the court, the agency, or the parties. The plaintiff is excused from the exhaustion requirement on the grounds that exhaustion would be futile or useless.

*Id.* at 991 (citing *City of Charleston, S.C.*, 520 F.Supp.2d at 769-70).[7]

---

[7]   Similarly, in *City of Atlanta v. Hotels.com, L.P.,* 285 Ga. 231, 674 S.E.2d 898 (2009), the Georgia Supreme Court vacated a lower court's ruling that it had lacked subject matter jurisdiction because the plaintiff had failed to exhaust its administrative remedies.  The Georgia Supreme Court noted that the question of whether the tax ordinance applied to the defendants was "a strenuously contested issue" and held that the city "cannot be required to exhaust an administrative process as a prerequisite to obtaining a determination that the ordinance prescribing that process even applies in the first place." *Id.* at 900. The court went on to note that the OTCs' "insistence" that they were not subject to the tax ordinance reflected that they would not acquiesce to an audit in any case. *Id.* at 902. *See also Columbus v. Expedia, Inc.,* No. SU-06-CV-1794-7, slip op. at 17-19, 2008 WL 4448800 (Ga.Super.Ct. Sept. 22, 2008) (holding that a factual issue existed with respect to the futility of the required administrative remedy, because the defendant "maintains the position that it is not subject to the authority of

Ignoring these decisions and this Court's finding as to the futility of a demand of payment, Defendants instead devote only one paragraph to this crucial issue of futility by quoting one decision -- *City of Oakland v. Hotels.com LP*, 572 F.3d 958 (9th Cir. 2009) – in which the court found that the taxing authorities had failed to exhaust certain statutorily mandated administrative procedures under California law. Opposition at 11. That case, however, involved several important distinctions from this case. First, the *City of Oakland* court did not consider (because that plaintiff did not raise), the threshold issue discussed in Section II.A.1, *supra*, regarding the fact that "exhaustion of administrative remedies" jurisprudence does not even apply in a case such as this where the government is bringing the enforcement action. Second, and most important, the record on futility before the court in *City of Oakland* was hardly the same record before this Court. As explained in detail above, these Defendants' behavior in Florida, highlighted by their actions with respect to Miami-Dade County, have provided total clarity about the futility of any pursuit of an administrative audit and assessment in this case. Finally, it is hardly appropriate for the Court to decide ***the merits*** of this argument in the context of a class certification motion. At this stage, the only issue for the Court to decide is whether such an issue can be resolved on a class-wide basis.[8] For the reasons already articulated, it plainly can.[9]

Monroe County cannot envision any reason why it (or any other Florida county) should be required to spend significant resources and time exhausting administrative remedies that "would be a charade and would simply delay the inevitable judicial resolution of the legal issues presented, while providing little or

---

Plaintiff Columbus or any other municipality and that it cannot be required to charge, collect or remit taxes on the room rate").

[8] *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78, 94 S.Ct. 2140 (1974) (quoted in *Hudson v. Delta Air Lines, Inc.,* 90 F.3d 451, 457 (11th Cir. 1996)) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.").

[9] Defendants' reliance on *Orange County v. Expedia* is similarly misplaced because in that case the taxing authority failed entirely to raise the issue of futility of administrative remedies. 985 So.2d 622, 628 (Fla. 5th DCA 2008) (noting that "the County does not assert any of the recognized exceptions to the requirement for exhaustion which include cases in which administrative remedies are inadequate or futile").

no benefit for the court, the agency, or the parties." *City of Goodlettsville,* 605 F.Supp.2d at 991. Nor have Defendants pointed to any reason that would justify such a waste. The bottom-line is that this case presents a classic situation where exhaustion of administrative remedies would be futile, costly, and would provide *no* countervailing benefit. [10]

**B.      Common Issues Will Predominate In This Case.**

As required by Rule 23(b)(3), common questions of law or fact predominate over any individual issues in this case. In fact, it is difficult to imagine a scenario where a finding of liability as to one Class member would so automatically result in a finding of liability as to every other Class member. As discussed below, the Defendants have openly conceded that their business practices (which will determine whether the Defendants are liable for the TDT) are the same across all Class member counties. Moreover, there can be no dispute that the operative language in the various Class members' ordinances are identical. Because these two critical facts establish commonality on all issues of liability, the Defendants are left to fixate on issues

---

[10]  It should also be noted that the Defendants have argued this merits-based affirmative defense for the first time in their Opposition brief, and have raised it at a point in this litigation when the Plaintiff has, due entirely to the fault of Defendants, been improperly deprived of  evidence that we expect will further prove futility. For example, several months ago Plaintiff served discovery requests upon Defendants requesting that they produce all communications with taxing authorities in the State of Florida. We fully expect those documents to evidence communications by Defendants similar to those had with Monroe County – namely, that Defendants refused to acknowledge any obligation or intention to pay the tax, and that they intend to fiercely litigate the issue. Defendants, however, refused to turn over any such records for any counties other than Monroe County, and even falsely stated that they were not aware of any such communications with Monroe County. *See* Defs' Opp. to Motion to Compel at 10 "Defendants agree to produce all communications with Monroe County, but have performed a search and have not located any – other than this lawsuit."  This was a particularly stunning (mis)representation given that there is now undisputed record evidence in this case that such communications did in fact occur over two years ago and, in fact, ***that members of the law firm representing Defendants in this case were directly involved in such communications. See*** Shillinger Depo. p. 17, ln. 17-20 (explaining that a lawyer from McDermott Will & Emery's Chicago office had been sent by the OTCs to meet with Monroe County officials). Upon a Motion to Compel filed by Plaintiff, Magistrate Judge Simonton ordered the Defendants to produce all such documents. *See* D.E. # 70, at 3. However, those documents just began to arrive at undersigned counsels' office yesterday, in CD format, combined with numerous other documents which Defendants improperly refused to produce and which they were ordered to produce by Magistrate Judge Simonton. Obviously, we have not had an opportunity to review those documents, much less depose Defendants on the subject of those documents, at the time of the filing of this brief. Since Defendants have improperly withheld these documents from Plaintiff for months, it would certainly not be proper at this stage to credit the Defendants' one-sided allegations as to the facts which may ultimately be refuted by this evidence. *See Eisen,* 417 U.S. at 177-78 ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.")

that will only be relevant to the damages part of this litigation, and to offer up a handful of wholly irrelevant issues to class certification. Each of these red herrings is addressed below.

### 1. Defendants Have Conceded That Their Actions Are The Same Across All Class Member Counties.

First, it must be noted that the Defendants have stipulated that they deal with individual hotels in the same way across all counties in the State of Florida – i.e., they use the same Merchant Model system. Opposition at 4, n.2; Order on Plaintiff's Motion to Compel D.E. # 73, at 2 ("Defendants stipulated that the merchant agreements were relevant to Plaintiff's class certification motion, and again stipulated that as to Plaintiff's class certification motion the merchant agreements with respect to Monroe County were representative of the statewide merchant agreements.") It is undisputed in this case that in all of the Class member counties, Defendants collect and remit taxes from their customers on only the retail rate rather than on the "total consideration paid" as required under the Enabling Act. The Defendants' conduct has thereby caused each Class member to suffer the same kind of injury – substantial unrealized tax revenue.

### 2. The Operative Language From The Ordinances Is The Same Across All Class Member Counties.

Moreover, Plaintiff and each Class member share identical or substantially similar TDT ordinances and therefore share identical legal theories based on those ordinances. Because each county's TDT ordinance was enacted under the authority of, and based on the precise language in, the Enabling Act, common issues will predominate over any individual issues in this case. Indeed, Plaintiff anticipates that *all* issues as to the Defendants' liability in this case will be common among the Class members.

At least 59 of the 67 counties within the State of Florida have levied a TDT on the privilege of "rent[ing], leas[ing], or let[ting]" accommodations which is to be collected and remitted by "the person receiving the consideration for the lease or rental." Because the operative language from the Ordinances is the same across all Class member counties, there will be simply no variance of issues among class member

counties as to the liability portion of this case. For these reasons, Plaintiff readily satisfies the low standard

for commonality, as the court held in a similar case against these same defendants:

> Plaintiff asserts that Defendants' policy and practice of paying hotel occupancy taxes based on the wholesale or net rate that they negotiate with the hotels, rather than the retail rates charged to the hotel occupants, violates all 175 municipal ordinances and results in ongoing monetary losses to all of the putative class members. The commonality requirement under Rule 23(a)(2) has clearly been met in this case.

*City of San Antonio v. Hotels.com,* No. 06-00381, 2008 WL 2486043 at *5 (W.D. Tex., May 27, 2008).

Similarly, the court in *City of Gallup, New Mexico v. Hotels.com, L.P.,* found as follows:

> In this case the common question of law is whether Defendants … have violated the ordinances by the manner in which they have remitted lodgers' taxes to Plaintiff and the other class members. Having reviewed each of the thirty-some municipal and county ordinances provided by Plaintiff, the Court finds that while there are some differences, the relevant portions of all but five of the ordinances are substantively identical. In terms of factual questions, the Court recognizes that Defendants' business model is the same with respect to any hotel or motel at issue, regardless of which city or county in which it is located.

No. 07-cv-00644, slip. op. (D.N.M. July 2, 2009), attached hereto as Exhibit "I," at 9.

### 3.  The Damages-Related Issues Which Defendants Raise Do Not Prevent Class Certification.

Forced to silently concede that the operative language in all Class members' ordinances is identical,

and to formally concede that their behavior is the same across all Class member counties, the Defendants

resort to pointing out slight variances among the ordinances which, under Eleventh Circuit precedent, are

simply irrelevant to class certification. Specifically, Defendants argue that common issues will not

predominate in this case because "the TDT ordinances have different provisions regarding (i) the rate of the

tax, (ii) the penalties and interest in event of non-payment of tax, and (iii) registration requirements."

Opposition at 18.

As to the first two of these points, the applicable "rate of the tax" and the "penalties and interests"

that will be imposed on top of the OTCs' tax liability are simply factors to be plugged into the damage

calculation formula at the damages phase of this case.[11] More importantly, even if the calculation of damages in this case were a complex, individualized issue (which it is not) – such damage calculation issues do not defeat class certification, under well-settled Eleventh Circuit precedent. *See Allapattah Servs. v. Exxon Corp.,* 333 F.3d 1248, 1261 (11th Cir. 2003) ("[N]umerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate.").

On page 18 of their Opposition, Defendants claim that "the Court would be required to individually examine ***each and every transaction*** by each Defendant." That is simply untrue. The calculation of damages in this case will actually be much simpler than in many class action cases, and can easily be performed by Monroe County's retained expert. The undisputed evidence in this case will show that the Defendants have failed to collect and remit the tax on the "retail" component of the room rental that is their mark up. Each Defendant specifically tracks the amount of this mark up in every transaction, together with the transaction date, and room location. All of this information is aggregated in the transactional data that has just been recently produced in this litigation in the form of Microsoft Excel spreadsheets, and is suitable for easy mathematical and formulaic calculations, including factoring in any variations in the tax rate, penalties, or interest applicable in the county in which the room was booked. Defendants themselves calculate a tax recovery charge for each transaction, albeit improperly on only the "wholesale" rate at which they acquire the hotel rooms form the hotels, which is easily aggregated based on the transactional data. Accordingly, the tax due on the mark-up for every transaction can be easily determined, and this calculation can be aggregated and determined for each Class member county.

---

[11]   Moreover, it is unclear in what sense the "penalties and interests" would vary across Class members. In accordance with the Enabling Act, the penalties provided under Fla. Stat. 212.12(2) are incorporated by reference into each counties' TDT ordinances. *See* Fla. Stat. 125.0104(2)(a), 125.0104(2)(g). Accordingly, the penalties imposed will be the same across all Class member counties.

Moreover, these Defendants are fully aware that such calculations are feasible. When granting class

certification to various New Mexico taxing authorities in their action against these OTCs, the *City of Gallup*

court made the following observation: "The Court further notes that Defendants have not offered evidence

to contradict the opinion [of] Plaintiff's proposed accounting and valuation expert Shannon Farr that class

members' individual damages can be calculated 'by use of a simple mathematical formula.'" *City of Gallup,*

slip. op., Exhibit "I," at 9. *See also* note 1, *supra*. (listing verdicts against these Defendants).

Without providing any explanation, Defendants also claim that "registration requirements" differ

across the TDT ordinances. It is unclear to which registration requirements Defendants are referring and

what impact those requirements could possibly have on the liability issues in this case. Either the OTCs are

subject to collect the "total consideration paid" for the rental of the hotel rooms which they sell to customers,

or they are not. Any variation in "registration requirements" in different counties would have no effect on

the tax liability under the operative language.

### 4. The Dormant Commerce Clause Question Is Yet Another Issue That Would, By Necessity, Be Resolved On A Class-wide Basis.

Defendants also slip in a one-paragraph, merits-based, flawed argument that imposition of the TDT

on the Defendants would violate the Dormant Commerce Clause, which requires that a taxpayer have "a

substantial nexus" with a taxing jurisdiction. Opposition at 19 (citing *Quill Corp. v. North Dakota,* 504 U.S.

298, 309 (1992)). Defendants claim that therefore this Court would have to examine the various connections

between these OTCs and each Class member county. Again, that is simply untrue.  It is precisely the OTCs'

business of renting, leasing, or letting hotel rooms which provides "a substantial nexus" with these Class

member counties. And these Defendants have stipulated that their business model is identical across all

Class member counties. Accordingly, this simply will not be an issue that differs among Class member,

because if the OTCs have "a substantial nexus" in any one Class member county, they will have a

substantial nexus in *every* Class member county.

Nevertheless, if forced to dispute this defense at this premature point, the County is prepared to do so. The simple fact is that these Defendants do substantial business in each Class member county. The OTC Defendants: (1) enter merchant agreements with each Florida hotel with which they do business, (2) enter room sales contracts with each customer through the use of an interactive website which is made available throughout the State of Florida, and (3) collect TDT taxes directly from those customers (albeit it on the incorrect amount).  As another federal district court held in a nearly identical case, these connections fully satisfy the "substantial nexus" requirement:

> Defendants contend they cannot be 'taxed' on activities in cities with which they have no substantial nexus. Again, this argument is a red herring because the occupant of the room (who is the taxpayer) is already being taxed, and the Defendants have already been collecting and remitting taxes on the rooms they sell. The only question in this lawsuit is whether the Defendants have an obligation to collect and remit occupancy tax on the higher sell rate, rather than on the lower net rate. If Defendants believed that they had no obligation whatsoever to collect and remit occupancy taxes, they would not have been doing so. None of the cases city by Defendants appear to be applicable on this point.

*City of San Antonio*, 2008 WL 2486043 at *14.

### 5.   The Unjust Enrichment and Conversion Claims Can Be Litigated On A Class-Wide Basis.

Defendants next relegate to a footnote a weak assertion that the Plaintiff's unjust enrichment claim is unsuitable for class treatment.  Opposition at 17 n. 14.  That argument is merely a rehash of Defendants' erroneous arguments that common questions do not predominate.  The cases cited by Defendants in which courts denied class treatment of unjust enrichment claims are inapposite, as the particular claims presented in those cases (unlike those here) required individualized proof of each claimant's particular unique circumstances.[12]  Here, in stark contrast, there are literally *no* material differences of law or fact necessary to

---

[12]  For example, Defendants cite to *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256 (11th Cir. 2009).  In that case, the Eleventh Circuit overturned certification of an unjust enrichment claim brought by former T-Mobile sales employees who asserted that they were entitled to additional commissions.  The compensation structure for each employee varied and changed over time, and there were alleged differences in the extent to which each employee was informed of the applicable policies.  *Id.* at 1261-62; 1274-75.  As such, "whether or not a given commission charge back was 'unjust' [would] depend on what each employee was told and understood about the commission structure and when and how commissions were 'earned.'"  *Id.* at 1275.  Under the particular circumstances of that case, the unjust enrichment claim required individualized proof that overshadowed the common questions.  *See also, e.g., Ortiz v. Ford Motor Co.*, 909 So. 2d 479, 481 (Fla. 3d DCA 2005) (finding that classwide proof did not

establish this Class's unjust enrichment claim.  In such circumstances, many courts have recognized that class certification of unjust enrichment is appropriate. *See Smith v. Georgia Energy USA, LLC*, 259 F.R.D. 684, 688-90 (S.D. Ga. 2009) (certifying unjust enrichment claim); *Sher v. Raytheon Co.*, 2009 WL 3193152, Case No. 8:08-cv-889-T-33AEP (M.D. Fla. Sept. 30, 2009) (same); *Veal v. Crown Auto Dealerships, Inc.*, 236 F.R.D. 572, 581 (M.D. Fla. 2006) (same); *In re Terazosin Hydrochloride Antitrust Lit.*, 220 F.R.D. 672, 697-98 (S.D. Fla. 2004) (same); *Singer v. AT&T Corp.*, 185 F.R.D. 681, 688 (S.D. Fla. 1998) (same).

Likewise, Plaintiff's conversion claim merits class certification because the counties' claims in this case are based on the Defendants' common scheme to retain tax revenues which should have been remitted to the counties.  *See, e.g., Knuth v. Erie-Crawford Dairy Cooperative Assoc.*, 463 F.2d 470, 472 (3d Cir. 1972) (allowing trial of class action asserting conversion claim); *Clower v. Wells Fargo Bank, N.A.*, 259 F.R.D. 253 (E.D. Tex. 2009) (certifying class action asserting conversion claim); *Winkler v. DTE, Inc.*, 205 F.R.D. 235, 238 (D. Ariz. 2001), (certifying a class on a conversion claim).  Moreover, the *City of San Antonio, Texas* court certified all of the claims brought by those taxing authorities against these OTC Defendants, including claims for conversion and unjust enrichment. *See City of San Antonio, Texas v. Hotels.com*, No. 06-00381, Supplemental Order On Class Certification, slip opinion, entered Sept. 28, 2009, attached hereto as Exhibit "J."

### C.   The Florida Department Of Revenue Is Not A Necessary Party In Order For All 59 Counties To Be Class Members.

Pursuant to Fla. Stat. § 125.0104(10), Florida counties can chose to locally administer their TDTs, or allow that function to be conducted by the Florida Department of Revenue ("DOR"). Defendants argue that the proposed class definition is overbroad because it includes those counties that have chosen to have

---

predominate where unjust enrichment claim required proof that varied depending on which model of the allegedly defective car was at issue, whether each class member had seen a rollover warning, which warning had been seen, how it was interpreted, and what impact the warning had on their understanding of the risk).

the DOR administer their TDT.  According to Defendants, these counties do not have the "proper standing to pursue their claims."  Opposition at 8.  This argument can be disposed of quite easily.

Indeed, putting DOR's role in administering the TDT in its proper statutory perspective shows precisely why the counties *are* proper class members.  Each of the counties included in the class definition has enacted a TDT, and in so doing, has levied a tax.  Defendants' failure to pay the proper amount of TDT levied has damaged these counties, not the DOR.  Instead, DOR's only role is in administration of the TDT – it acts as collection agent for the county and "*shall* distribute any collections so received." Fla. Stat. § 125.0104(10)(emphasis added).   The DOR, therefore, has no discretion; it *must* distribute the funds collected on behalf of a county to that county, less the statutorily determined costs of administration.  Accordingly, to the extent DOR had any role in this action, it would be as a post-judgment collection agent.[13]  Consequently, under even the most basic standing analysis, those counties in which the DOR administers the TDT have standing because "they have "a personal stake in the outcome of the controversy," and this "dispute touches upon the legal relations of parties having adverse legal interests.*" Flast v. Cohen*, 392 U.S. 83, 101 (1968).

Even if this Court were to find that this standing argument has any merit, the Defendants are simply incorrect that the Class would not then be numerous enough for certification. According to the Defendants' own calculation, "16 Florida counties … do not locally administer their TDT."  Opposition at 9.  With 59 counties with a TDT, even if the 16 Florida counties which do not locally administer their TDTs were later excluded from the Class, that would not destroy numerosity, as 43 Class members would remain. As noted in Plaintiff's Motion for Class Certification, the Eleventh Circuit has held that "[g]enerally, less than twenty-

---

[13] The cases relied on by Defendants do nothing to change this analysis; they are both easily distinguishable.  *Atl. Gulf Cmtys. Corp. v. City of Port St. Lucie*, 764 So.2d 14, 20-21 (Fla. 4th DCA 1999) deals with the adequacy of the a city's notice under a entirely separate statute.  Similarly, the court in *Metro. Dade County v. Golden Nugget Group,* 448 So. 2d 515 (Fla. 3d DCA 1984), found that the county ordinance was invalid because it was irreconcilable with the state statute, which specifically provided that "the department [of Revenue] *shall* administer and enforce . . ." - it does not address whether a county that relies on the DOR to administer a tax can be a member of a class seeking damages for failure to pay taxes. (emphasis in original).

one [class members] is inadequate, more than forty adequate." *Cheny v. Cyberguard Corp.,* 213 F.R.D. 484, 490 (S.D.Fla. 2003) (quoting *Cox v. Am. Cast Iron Pipe Co.,* 784 F.2d 1546, 1553 (11th Cir.1986)). *See also* NEWBERG ON CLASS ACTIONS, § 3.5 at 247 (4th ed. 2002) ("as few as 40 class members should raise a presumption that joinder is impracticable and the plaintiff whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone."). Moreover, "where the question on numerosity is a close one, a balance should be struck in favor of a finding of numerosity, as the court always has the option to decertify pursuant to Rule 23(c)(1)." *Leszcynski v. Allianz Ins.*, 176 F.R.D. 659, 670 (S.D. Fla. 1997).

### D.   Class Treatment Is The Superior Method For Adjudication Of This State-Wide Dispute.

Defendants next claim that the Plaintiff cannot satisfy Rule 23(b)(3)'s superiority requirement because "[a]t least 14 (nearly 24%) of those putative class members are already individually pursuing actions against Defendants relating to the TDT." Opposition at 20. Defendants make this claim without citing to any case law, perhaps because the mere pendency of other litigation by potential class members is not ultimately the driving factor behind the superiority prong.[14]   As the Eleventh Circuit has routinely held, the predominance analysis (discussed above) has a tremendous impact on the superiority analysis because the more common issues predominate over individual issues, "the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claim." *Shane v. Humana, Inc*., 382 F.3d 1241, 1269 (11th Cir. 2004); *see also Vega* (predominance is the "central and overriding prerequisite for a Rule 23 (b)(3) class.")

Such is the case here.  Instead of litigating Defendants' liability for the TDT numerous times in courts across the state of Florida, wasting valuable judicial time and resources, "superiority" principles dictate that a class action is appropriate, where, as here, each of the currently pending cases (and any future ones) seeks a resolution on the same predominate issues before this Court.  *See* Advisory Committee Notes

---

[14] The pendency of other litigation does not affect the analysis because "pertinent and soundly reasoned authority prescribes that the pendency of a separate, individual action neither excuses a litigant from compliance with an applicable 'opt-out' procedure in a related class action nor obligates any party or court to treat the litigant as unique or different in any respect from other potential class members. *Demint v. Nationsbank, Corp.*, 208 F.R.D. 639,641 (M.D.Fla. 2002).

to Fed.R.Civ.P. 23 ("The burden that separate suits would impose . . . upon the court calendars, may also be fairly considered.").

Furthermore, there is nothing in the record to support Defendants' assertion that any of the counties that have already begun the process of seeking payment from these Defendants would oppose joining the class in favor of proceeding unilaterally. Once a class is certified in this case, it would not be unsurprising that the counties with currently pending actions against Defendants would prefer to become part of the class, particularly with an imminent trial scheduled in July. The testimony relied on by Defendants regarding Orange County's position bears this out, as their concern was about being "further along in the process than we are." Shillinger Depo. p. 185, ln. 15-18

Finally, Defendants' contention that a class action is not superior because the putative members of the class are sovereign county governments is similarly baseless. Any issues perceived by the Court, or the putative class members, regarding sovereign governments becoming part of a class are easily cured by the class action procedures themselves – the counties can simply choose to opt out.

This Court is a highly desirable forum in which to litigate all of the claims of the Class members, and it makes little sense to have dozens of simultaneous cases pending in state and federal courts when the case is composed entirely of common issues. Moreover, there are no anticipated difficulties in maintaining this case as a class action. The Class members will be readily identifiable and easily provided notice of the pending action, and all liability issues can be determined under a single legal theory.

This case involves common issues of liability, a common course of conduct by Defendants, and common sources of evidence among approximately 59 Florida counties. Therefore, a class action will result in a more efficient resolution of these common issues, rather than the piecemeal litigation that Defendants have been orchestrating across the state to-date.

### E.   The Adequacy Requirement Is Also Clearly Met.

Left without any valid substantive arguments in opposition to certification of the Class, Defendants next claim that Monroe County is not an adequate representative in this case.  The Eleventh Circuit has explained that "class counsel and the class representatives are adequate representatives of the class if (1) 'plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation' and (2) the named plaintiffs lack 'interests antagonistic to those of the rest of the class.'" *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 726 (11th Cir. 1987).  Notably, Defendants do not claim that plaintiffs' counsel is unqualified, inexperienced, or generally unable to conduct this litigation.  Nor do Defendants claim that Monroe County has any "interests antagonistic to those of the rest of the class."

Rather, Defendants argue that Monroe County is not an adequate representative because Monroe County's Chief Assistant County Attorney, Bob Shillinger, is allegedly not involved enough in the details of this litigation, and because the Monroe County Commission has not yet formally approved the retention of all of the proposed Class counsel. Both of these arguments are frivolous.

As a threshold matter, the allegations that Mr. Shillinger does not know enough about the details of this case are particularly ridiculous in light of the relevant legal standard on this issue. "The Supreme Court in *Surowitz v. Hilton Hotels Corp.,* [383 U.S. 363, 370-74 (1966),] expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 61 (2d Cir. 2000). In *Surowtiz,* the plaintiff was deemed an adequate representative even though she spoke limited English, did not understand the complaint and knew what the lawsuit was about only to a "very small degree." 383 U.S. at 366. "[M]ost courts have followed the *Surowitz* rationale in rejecting any challenge to adequacy for class actions under amended Rule 23 based on ignorance of the facts or theories of liability." 1 William B. Rubenstein et al., *Newberg On Class Actions,* 3:34 (4th ed. 2009). Courts in the Eleventh Circuit are no exception. *See, e.g., Avery v. Uniroyal Tech. Corp.,*

No. 02-02238, 2005 WL 1205607 at *6 (M.D.Fla. May 20, 2005); *Spinelli v. Capital One Bank*, 2009 WL 3053693 at *4 (M.D.Fla. Aug. 20, 2009).

Moreover, even if there were not such a lenient standard regarding a named representative's familiarity with a case, in his deposition on January 8, 2010, Mr. Shillinger clearly demonstrated a close familiarity with this case and with related litigation. *See, e.g.,* Shillinger Depo. p. 160, ln. 2 – 23; p. 232, ln. 13-21. Mr. Shillinger testimony established (1) a clear and cogent understanding of precisely what this litigation is about; (2) that he has followed the litigation against these OTCs across the country over the last several years; and (3) that he has been in frequent contact with county attorneys' offices from around the state about this tax dispute.[15]  Indeed, Mr. Shillinger's relevant files (which have been produced to the Defendants) are replete with documents about this litigation. After fully investigating the matter and observing the progress (or, rather, the lack thereof) of the piecemeal litigation and administrative proceedings across the state against the OTCs, Mr. Shillinger retained highly qualified counsel, who have extensive experience in class action litigation, including success in similar cases brought by other taxing authorities against these sane OTCs. *See* Motion for Class Certification, at Ex. I.[16]

Second, as to the retention of class counsel by Monroe County, the Monroe County Board of Commissioners formally passed a resolution which retained undersigned counsel, Todd Aronowitz and Paul Weiss, for this case. That approved retention letter expressly contemplates additional counsel being added in the future. See Letter Agreement, ¶ 7, attached hereto as Exhibit "K." Mr. Shillinger, who is the

---

[15] Ms. Pamela Sellars, Monroe County's Auditor, who was also deposed in this action, similarly exhibited a thorough understanding of exactly what this litigation is about. Sellers Depo., p. 69, ln. 2-14; p. 92, ln. 8-16.

[16] Defendants also make the odd "accusation" that "the only thing Plaintiff was interested in was 'FREE MONEY.'" Opposition at 23; Ex. I. First, it should be noted that the email containing that phrase to which the Defendants quote (and attach to their Opposition brief) was not sent by an agent of the County at all, but rather was sent by an individual, Mr. James Hendrick, who had *previously* worked as an attorney for the County, and who was simply expressing his concern to a current County attorney about the County's desperate need to recover lost revenue. *See* Shillinger Depo. p. 11, ln. 21-24. As the remainder of Mr. Hendrick's email states, "It would be a shame to let this pass by, especially given the County's current financial condition." *See id.* The strapped financial condition of all Florida counties (due in no small part to the tax evasion scheme employed by the Defendant OTCs) is no secret, and is an important, indeed, an urgent matter. It was for this important reason that Monroe County initiated this suit, and has sought to resolve this matter cleanly and efficiently across all Florida counties.

County's chief litigation counsel, was fully aware when the additional undersigned attorneys began working

on this case, and Mr. Shillinger has testified that not having this additional counsel formally retained by the

Board of Commissioners was simply "an oversight" on his part. Such a slight oversight is hardly the type of

serious adequacy issue (such as conflict of interest or incompetence) that is contemplated by Rule 23.

Defendants further claim that Monroe County is not an adequate class representative "because the

main County point person responsible for this information has many other non-related job assignments."

Opposition at 23.   In fact, the limited resources of Monroe County – and numerous other limited

government offices around the state – is precisely why a class is the superior method of adjudication of this

dispute. *See Hawaii v. Standard Oil Co. of California,* 405 U.S. 251, 266, 92 S.Ct. 885 (1972) ("Rule 23 of

the Federal Rules of Civil Procedure provides for class actions that may enhance the efficacy of their limited

resources to achieve a more powerful litigation posture.")

## III. CONCLUSION

For all of these reasons, Plaintiff submits that Defendants have failed to raise any viable arguments

against certification, and therefore Plaintiff respectfully requests that the Court certify a Class consisting of:

"All counties within the State of Florida that: 1) enacted a tourist development tax under authority of F.S.A.

§ 125.0104; and 2) have not received the tax due on the amount received by the Defendants as consideration

for the rooms rented by them located within those counties." Compl. ¶ 34.

DATED:  January 22, 2010

By: /s/ Jay B. Shapiro
    Jay Shapiro (FBN 766361)
    Abigail E. Corbett (FBN 31332)
    Zachary S. Bower (FBN 17506)
    **STEARNS WEAVER MILLER WEISSLER**
    **ALHADEFF & SITTERSON, P.A.**
    150 West Flagler Street
    Suite 2200 – Museum Tower
    Miami, FL 33130
    Telephone: (305) 789-3200

Tod Aronovitz (FBN 186430)
**ARONOVITZ LAW**
777 Brickell Avenue, Suite 850
Miami, FL 33131
Telephone: (305) 372-2772

Paul M. Weiss
Michael J. Lotus
**FREED & WEISS LLC**
111 West Washington Street, Suite 1331
Chicago, IL 60602
Telephone:     (312) 220-0000

Richard J. Burke
**RICHARD J. BURKE LLC**
1010 Market Street, Suite 660
St. Louis, MO 63101
Telephone:     (314) 880-7000

James E. Cecchi
**CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN**
5 Becker Farm Rd.
Roseland, NJ 07068
Telephone:     (973) 994-1700

***Attorneys for Plaintiff County of Monroe, Florida***

COUNTY OF MONROE v. PRICELINE.COM
CASE NO. 09-10004-MOORE/SIMONTON

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on January 22, 2010, I electronically filed the foregoing

document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is

being served this day on all counsel of record or *pro se* parties identified on the attached Service

List in the manner specified, either via transmission of Notices of Electronic Filing generated by

CM/ECF or in some other authorized manner for those counsel or parties who are not authorized

to receive electronically Notices of Electronic Filing.


/s/Jay B. Shapiro_____
Jay B. Shapiro

COUNTY OF MONROE v. PRICELINE.COM
CASE NO. 09-10004-MOORE/SIMONTON

## SERVICE LIST

*The County of Monroe, Florida v. Priceline.com Incorporated, et al.*
**Case No. 09-10004-MOORE/SIMONTON**

Steven E. Siff (FBN 352330)
Justin B. Uhlemann (FBN 568872)
**McDERMOTT WILL & EMERY LLP**
201 S. Biscayne Blvd., Ste. 2200
Miami, Florida 33131
Telephone: (305) 358-3500
Facsimile: (305) 347-6500

*Counsel for All Defendants*

Elizabeth B. Herrington
Mark J. Altschul
**MCDERMOTT WILL & EMERY LLP**
227 West Monroe Street, Suite 4400
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700

*Attorneys for Trip Network, Inc. (d/b/a CheapTickets.com) and Orbitz, LLC*

Darrel J. Hieber
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Facsimile: (213) 621-5220

Karen L. Valihura
Randolph K. Herndon
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Rodney Square, P.O. Box 636
Wilmington, Delaware 19899
Telephone: (302) 651-3000
Facsimile: (302) 651-3001

*Attorneys for priceline.com Incorporated and Travelweb LLC*

James P. Karen
Deborah S. Sloan
**JONES DAY**
2727 North Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

*Attorneys for Expedia, Inc., Hotels.com, L.P., and Hotwire, Inc.*

Brian S. Stagner
Stacy Russell
**KELLY HART & HALLMAN, LLP**
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 878-3561
Facsimile: (817) 878-9767

*Attorneys for Site59.com, LLC, and Travelocity.com LP*

#162008 v2